Cahill, Adm'r, etc., vs. Layton and another.

Cahill, Administrator, etc., vs. Layton and another.

*April 10 — May 31, 1883.*

*Right of action for injury from structure over private roadway.*

A complaint alleging that for many years last past all the proprietors and occupants of lots in the south half of a block, including the defendants, had maintained a roadway along the dock-line of the adjacent river, extending from a public alley and highway in the middle of the block to the street on the south of the same, thus at all times affording to said occupants and proprietors and their agents and servants, and to the public in general, access for teams and wagons to the rear end of the buildings situated on such half-block; that said roadway was constantly used by teams and vehicles of all kinds and especially by those employed in the business of the occupants of the half-block, and that defendants well knew of such use; that at the time in question and for a long time prior thereto the defendants had kept and maintained a large platform made of timbers across said roadway, spanning the same at an elevation such that a team of horses and a wagon of ordinary height could be driven under it, but not sufficiently elevated to admit of the passage of a driver sitting upon such wagon; that such platform was dangerous to persons driving along said roadway and that defendants had long known of its dangerous position and condition; that plaintiff's intestate was employed by one of the occupants of the half-block to drive a team in hauling pork to and from the rear end of the employer's store, and that while so driving a team along said roadway, in the evening, after dark, he was killed by coming into collision with said platform; that at the time of the accident the defendants had neglected to have any light or other signal at such platform to warn persons of its existence, and that the deceased did not know of its existence and was guilty of no negligence — is *held* not to state a cause of action. *Thayer v. Jarvis*, 44 Wis., 388, distinguished.

ORTON, J., dissents

Cahill, Adm'r, etc., vs. Layton and another.

APPEAL from the Circuit Court for *Milwaukee* County.

The complaint alleges the death of John Shea, on October 6, 1880, the appointment of the plaintiff as his administrator, and that the defendants, as copartners, had for many years last past, and were still, using and occupying lot 6, in the south half of block 87, in the Fourth ward of the city of Milwaukee, and the brick building and structures thereon, and then proceeds as follows:

" That said block lies on the east side of West Water street, between Fowler street on the south and Clybourn street on the north (all of which said streets are public highways in said city), and extends from said West Water street to the edge or dock-line of Milwaukee river, and has a public alley, which is also a public highway, extending through the middle thereof from said West Water street to the said dock-line of said river; and that for many years last past all the proprietors and occupants of lots and parts of lots in the south half of said block 87, including the said defendants, have maintained a roadway extending along the dock-line of said river from the east end of said Fowler street to the east end of said alley, thus at all times affording to all said occupants and proprietors, and their agents and servants, and to the public in general, access for teams and wagons to the rear ends of all the various buildings situated on said half-block, and also a passage along said dock-line of said river to said West Water street, either by way of said alley or by way of said Fowler street, as the case might be; and that for many years last past, and particularly on the said 6th day of October, 1880, the said roadway last above mentioned was, and has been, constantly used as a drive-way for teams and vehicles of all kinds, and more especially for teams employed in and about the business of occupants of said half-block in which it is located as aforesaid; and that for many years last past, and particularly on said 6th day of October, 1880, the said defendants well knew that said roadway was so con-

stantly used for the passage of teams and vehicles as aforesaid by any and all persons having any occasion therefor.

"That on said 6th day of October, 1880, and for a long time prior thereto, the said defendants kept and maintained a large platform, made of timbers, joists, and planks, over and across the said roadway above mentioned, extending from the rear or east end of the brick building occupied by them as aforesaid, to the dock-line of said river, so as to completely cover and span the said roadway, at an elevation above said roadway such that a team of horses and a wagon of ordinary height could be driven under it along and upon said roadway without hindrance, but not sufficiently elevated to admit of the passage of a teamster or driver sitting upon such wagon, and by reason of the premises said platform then and there was, and for a long time had been, dangerous to persons driving teams upon and along said roadway, of which said dangerous position and condition of said platform the said defendants were well aware on said 6th day of October, 1880, and for a long time prior thereto.

"That on said 6th day of October, 1880, the said John Shea, deceased, was employed by Messrs. Plankinton & Armour, occupants of premises in said half-block adjoining the said premises occupied by said defendants, to drive a team in hauling pork to or from the rear end of the store of said Plankinton & Armour in said half-block; that late in the evening of said last-mentioned day, to wit, after it had become dark, the said John Shea, while so in the employ of Plankinton & Armour, as aforesaid, and while the said defendants so kept and maintained the said platform over and across the said roadway as aforesaid, was lawfully driving a team of horses, drawing a common freight wagon loaded with pork in barrels and other goods, upon and along said roadway going northward, and unaware of said nuisance and dangerous obstruction of the road, intending to drive to said West Water street by way of said alley, he, the said John Shea,

then and there riding on the wagon and guiding his horses; that while he, the said John Shea, was then and there so driving said team of horses and loaded wagon as aforesaid, with due care and diligence upon and along said roadway, he was by motion of said wagon suddenly and without any previous warning or notice, with great force and violence, driven and forced against the south edge of said overhanging platform, so that said platform collided with his head and breast and threw him backward upon the barrels in said wagon, whereby he was so greatly hurt, bruised, and crushed that in consequence thereof he died within an hour after the said collision.

" That the said defendants, at the time of said collision and accident, had omitted and neglected to keep or have, at or about said platform, any light or other signal to indicate the existence of said platform, and to warn persons lawfully passing over said roadway with teams and wagons of any danger of such collision, and that said collision, and the death of said John Shea, was caused wholly by the fault and neglect of the defendants in keeping and maintaining said platform over said roadway in the position and in the manner aforesaid, and without signal, barrier, or warning of any kind, they then and there well knowing the danger to which persons driving teams along said roadway were thereby exposed; that at the time of his death the said John Shea was a strong, able-bodied, healthy man, about nineteen years of age, and was the principal means of support and source of subsistence for his parents and younger brothers and sisters, his father being then crippled, and disabled to support his family; that by reason of the death of said John Shea, caused by the wrongful act and negligence of the defendants as aforesaid, his said parents have sustained damage to the amount of $5,000.

" Wherefore, by reason and force of the statute, this

plaintiff demands judgment against the said defendants for $5,000, besides the costs of this action."

The plaintiff appealed from an order sustaining a general demurrer to the complaint.

For the appellant there was a brief by *Cotzhausen, Sylvester, Scheiber & Jones*, and oral argument by *Mr. Cotzhausen*.

For the respondents there was a brief by *Wells, Brigham & Upham*, as attorneys, and *Jenkins, Winkler & Smith*, of counsel, and the cause was argued orally by *Mr. Brigham* and *Mr. Jenkins*.

CASSODAY, J.  The south half of the block extended to the dock-line of the river on the east, to Fowler street on the south, to West Water street on the west, and to an alley on the north, which alley extended from West Water street to the dock-line of the river.  In this south half of the block the defendants occupied a large brick building on a lot fronting on West Water street and extending back to the dock-line of the river, and from the rear end of which brick building a platform projected over a roadway to such dock-line, at such an elevation that a team of horses and a wagon of ordinary height could be driven under it, along and upon said roadway, without hinderance, but not sufficiently elevated to admit of the passage of a teamster sitting upon such wagon.  The several proprietors and occupants of lots and parts of lots in this half-block had for many years in common maintained a roadway extending across the ends of the several lots along the dock-line from the east end of Fowler street to the east end of the alley, which roadway passed under and was spanned by the platform above mentioned. Thus this roadway, Fowler street, and the alley at all times afforded to all such occupants and proprietors, and their agents and servants, and to the public in general, access for teams and wagons to and from the rear ends of all the

Cahill, Adm'r, etc., vs. Layton and another.

various buildings in said half-block to West Water and other streets of the city. In this half-block, and adjacent to the building occupied by the defendants, was a store occupied by Plankinton & Armour, the rear end of which extended to the roadway.

At the time of the injury the deceased was engaged in the employment of Plankinton & Armour, hauling pork from the rear end of their store, and while so engaged driving a team of horses drawing a common freight wagon loaded with pork in barrels and other goods from the rear end of their store along the roadway to and under the overhanging platform, his head and breast were forced against the south edge of the platform, whereby he was thrown backward upon the barrels in the wagon with such violence that he was greatly injured and soon died. Since the allegation is, not that he was thrown backwards *against* the barrels, but *upon* the barrels, it is quite evident that he must have been upon the barrels at the time, and not down on the floor of the wagon. It appears from the complaint that the several streets named were public highways, and that the alley was a public alley, and also a public highway. There is no allegation, however, that the roadway was a *public* roadway, highway, street, alley, or *public* way of any kind. There is no allegation that there had been any recent change in the condition or use of the roadway, but, on the contrary, it is alleged that it had been used in the same condition for many years. There is no allegation that there had been any recent change in the platform, but, on the contrary, it is alleged that it had been kept and maintained as it then was for a long time prior thereto. True, it is alleged that at the time of the accident the defendants had omitted and neglected to keep or have at or about the platform any light or other signal to indicate its existence, and that the death was caused wholly by the fault and neglect of the defendants in keeping and maintaining the platform over the roadway in the

position and in the manner stated without such signal; but there is no allegation that any light, signal, barrier, or warning of any kind had ever been kept or maintained by the defendants or any one.

The alleged liability is, therefore, based upon a state of facts which had existed for a long time prior to the injury; and since it is alleged that the roadway had been so maintained for many years, we may fairly infer that the platform had also been kept and maintained for the same period by some one, if not by the defendants. No negligence is, therefore, involved in the case, unless it be such as had existed for many years. No duty is involved, unless it be such as had never been performed. The breach of duty, if any, consisted first in the construction. But liability is not predicated upon any wrongful construction, from which we infer that such construction occurred prior to the time when the defendants became occupants. It is the continuance or maintenance of a structure which had existed for many years that is the ground of complaint. To support it, counsel seems to rely mainly upon *Thayer v. Jarvis*, 44 Wis., 388; *Corby v. Hill*, 93 Eng. C. L., 556; *Bennett v. L. & N. R. R. Co.*, 102 U. S., 577; and *Low v. Grand Trunk Railway Co.*, 72 Me., 313. This case seems to be clearly distinguishable from *Thayer v. Jarvis, supra*, for there the defendants had recently placed and left certain caustic substances in the passage-way through which the plaintiff's team was driven and thereby injured.

The same distinguishing element seems to have been present in *Corby v. Hill, supra*, for there the defendant had just recently placed slate and other material in a road leading from the turnpike to a lunatic asylum, in such a way as to be dangerous to travelers thereon, without giving notice or warning or other signal, and the only defense was that the same had been so placed by leave and license of the owner of the soil. In that case it was contended upon the part of

the defense, observed Cockburn, C. J., "that the owners of the soil, and consequently, also, any person having leave and license from them, may, as against any other person using the way by the like leave and license, erect an obstruction thereon, unless in the case of a holding out any allurement or inducement to such other person to make use of the way." The learned chief justice continued: "It seems to me that the very case from which the learned counsel seeks to distinguish this is the case now before us. The proprietors of the soil held out an allurement whereby the plaintiff was induced to come upon the place in question; they held out this road to all persons having occasion to proceed to the asylum as a means of access thereto. Could they have justified the placing an obstruction across the way, whereby an injury was occasioned to one using the way by their invitation? Clearly they could not." That case was followed in *Bennett v. Railroad, supra,* which was controlled by the principle of invitation and concealed danger. There the deceased was a passenger on the defendant's cars, and was unaware of the existence of the openings or hatch-holes in the depot floor, which had been left unguarded at night, and through one of which he fell and was injured.

*Low v. Grand Trunk Railway Co., supra,* was quite similar in principle. The plaintiff, a night inspector of customs in Portland, while on the defendant's wharf at night, fell into a gangway cutting the direct passage along the wharf transversely, and which had been left open and unguarded, and was injured. It was there contended that the nature of defendant's business at the wharf was not an invitation for the plaintiff to be there at night, but that he was a mere licensee. The court, however, thought otherwise, and held, in effect, that the business of receiving cargoes from foreign-going vessels, as the defendant did at its wharf, called for the presence there at night of the inspector of customs, to whom the defendant, by the prosecution of its business,

owed the duty of providing safe passage-way; and that the mere fact that he was there at night watching for smugglers without a lantern did not prove an absence of due care, since that was probably the best way of detecting smuggling.

The facts in the ·case before us are somewhat peculiar. They present some features not present in any of the above cases. Each of those cases presents some features not present here. There is no claim of any sudden obstruction of the roadway. There is no claim that the deceased was a trespasser at the time of the injury. Whether the roadway was used in pursuance of some grant, reservation, covenant, agreement, prescription, dedication, or under a mere license, does not appear, except in so far as may be inferred from the facts stated. There is nothing to indicate that it was ever laid out as a public highway. There is nothing to indicate it was such by prescription. There is nothing to indicate that the public authorities ever assumed any control over it. There is no claim that the city would be liable for any defect in it. The mere ·fact that the roadway afforded access to the rear ends of such buildings to the public in general, as well as to such occupants and proprietors, their agents and servants, did not convert such roadway into a public highway. True, one end opened into a public street and the other into a public alley, and it may and probably would be inferred that such openings constituted a license to the public to use it for all purposes to which it was adapted. *Danforth v. Durell,* 8 Allen, 244. But such license, or even had there been a dedication, would have been limited to the use of the roadway with the overhanging platform, as it was and had for years been maintained.

In *Le Neve v. The Vestry of Mile End Old Town,* 8 El. & Bl., 1063, it was observed by the court: " But over the place in question the public have not an unlimited right of passage, but only a qualified right of little or no practical utility, and subject to such use as the occupants of the adjoining

houses had been accustomed to make of it. The public, as of right, have only used such parts of the intermediate space as were not at the time occupied by the tenants of the houses, and if this user could be considered as evidence of a dedication, it could only be of a partial dedication to the public; and a place so partially and occasionally used for passage by the public, is not, we think, part of a street within the meaning of the act of parliament." Such use by the public, as here alleged, would not of itself, however, be a dedication to the public. To constitute. a valid dedication of such roadway to the public, there must be a clear intention on the part of the owner to so dedicate. *Brinck v. Collier*, 56 Mo., 160; *Bowers v. The Suffolk Manuf'g Co.*, 4 Cush., 332; *Durgin v. City of Lowell*, 3 Allen, 398; *Rowland v. Bangs*, 102 Mass., 299; *Dodge v. Stacy*, 39 Vt., 574; *Hall v. McLeod*, 2 Met. (Ky.), 98; *Davis v. Ramsey*, 5 Jones, Law (N. C.), 236; *Bushnell v. Scott*, 21 Wis., 451. It is not enough that there should be acceptance without dedication, nor dedication without acceptance. The two must concur. Id.

Undoubtedly, as remarked by the supreme court of New Hampshire, " a highway may be proved by long usage; but a way, to become public, must be used in such a manner as to show that the public accommodation requires it to be a highway, and that it is the intention of the owner of the land to dedicate the way to the public." *Barker v. Clark*, 4 N. H., 383; *State v. Nudd*, 23 N. H., 337. To the same effect, *Hall v. McLeod*, *supra*. The allegation here is that the roadway, street, and alley afforded to the public in general access for teams and wagons to the rear ends of all the various buildings situated on the half block. Besides, it is alleged that it had been maintained by the proprietors and occupants of the several lots and parts of lots in the half-block for many years. The allegations, therefore, restrict the use to particular classes of persons, and hence preclude a dedication to the public. But, in the language of the

supreme court of Kentucky, "when the appropriation is for the use of particular persons only, made under circumstances which exclude the presumption that it was intended for public use, it will not amount to a dedication. . . . The intention to create a private passway merely, excludes all idea of an intention to create a public highway; and as a dedication, to be valid, must be made to the public, it is manifest that an establishment of a private passway cannot be construed to be a dedication of the passway to public use." *Hall v. McLeod, supra,* 104.

In *Bagley v. People,* 43 Mich., 355, it was held that an alley is not a public highway and cannot be governed by the same rules. It is for the accommodation of abutting owners, and the public have no general right of way through it. The roadway in question, therefore, must be regarded as a private way. Being a private way, passage over it was, manifestly, either under a license, by prescription, or else a right secured by virtue of some grant, reservation, covenant, or agreement. If by virtue of such grant, reservation, covenant, or agreement, then the same was either in gross,— that is, attached to the person using it,— or appurtenant to the several lots. *Sanxay v. Hunger,* 42 Ind., 44; *Watson v. Bioren,* 1 Serg. & R., 227. If any such right was here secured, there certainly is nothing to indicate that the same was in gross, hence it would be construed to be appurtenant to the several lots. *Sanxay v. Hunger, supra,* and *Spensley v. Valentine,* 34 Wis., 154. So, if any such right was here secured, it was not that " of a suitable and convenient passage," as in *Atkins v. Bordman,* 2 Met., 457; *Wimbledon v. Dixon,* L. R., 1 Ch. Div., 362; and *Walker v. Pierce,* 38 Vt., 94; but a roadway definitely fixed, and actually used and maintained as fixed, for many years. Had there been any such grant, reservation, covenant, or agreement, an inspection of the same might have revealed the precise limits of the roadway in height as well as width, and whether such roadway

was with or without such overhanging platform. If no such right of passage was ever secured, except the one in question, with such projecting platform over it, then it is difficult to perceive how any liability could be created by reason of such projection remaining in the same position it had for a long time. If each of the several proprietors and occupants had for several years enjoyed all the rights ever secured, then certainly none of them ever had any ground for complaint. The same would be true if such right were secured by prescription.

In *Barnes v. Haynes*, 13 Gray, 188, a passage-way which extended from a street along and upon both sides of the dividing line between two lots, and was the only means of access to the back part of either, was used by the owners of both lots for *twenty years* without limitation, restriction, interruption, or objection, or any claim of right, except what might be implied from such use, and it was held that from such use a grant must be presumed to the owner of each lot of an easement in that part of the passage-way which was upon the other lot. But here no right of passage by prescription for twenty years, or any definite number of years, is alleged, unless it is to be inferred from the allegation that the way had been maintained for many years.

In *Richardson v. Pond*, 15 Gray, 390, it was held, however, that "where a right of way is proved to exist by adverse use and enjoyment only, the common and ordinary use which establishes the right, also limits and qualifies it." Applying that principle to the case before us, and it is apparent that if the right of passage were established by use and enjoyment of the roadway with the platform projecting as stated, then such right of passage was also limited and qualified by the right to continue the platform so spanning the roadway.

In *Salisbury v. Andrews*, 19 Pick., 250, the way had already been fixed by buildings, permanent inclosures, and use, and

it was "construed to be a grant of the way thus located, fixed, and defined." Portions of the passage-way which was called "Central Court," were not adapted to the same kind of use as other portions, and SHAW, C. J., said: "But we think the true meaning is that it is to be used with horses and carriages *as far as the court* [way] *is adapted to horses and carriages*, and on foot, with wheel-barrows, hand-carts, or such carriages as are commonly used for passage to a house *where horses and carriages cannot pass.*"

It was held in *Walker v. Pierce, supra*, that "when a party grants a private way, he is not bound by implication to construct or keep in repair the way granted. That duty rests on the grantee, if he wishes to enjoy the way, and he takes by grant the right to do so." The same, in effect, was held in Georgia, where the right of passage was acquired by prescription. *Puryear v. Clements*, 53 Ga., 232.

In *Gautret v. Egerton*, L. R., 2 C. P., 375, the demurrer to the declaration was sustained because it appeared therein that the "land was in the same state at the time of the accident that it was in at the time the permission to use it was originally given." It has often been held that a grant of a right of way will be construed with reference to the state and condition of the premises at the time the grant was made. *Stevenson v. Stewart*, 7 Phila., 295; *Messer v. Oestreich*, 52 Wis., 689.

In *Beecher v. People*, 38 Mich., 289, it was held that a roof twelve or fifteen feet above an alley was not necessarily an obstruction. In *Bagley v. People, supra*, it was held that a platform built in an alley, at the rear of a store, for convenience in transferring goods, cannot be assumed as matter of law to be an obstruction or a nuisance. "A way," says a very recent writer, "may be either a foot-way, or a bridle-way, or a drift-way for cattle, or a right of way with carts and carriages for agricultural purposes, or for mining purposes, or for all purposes whatever; indeed, it is difficult to

say how many kinds of ways there may be." Williams' Rights of Common, 324. Of course the character of a way is best defined by what it is, and the condition in which it has long been kept and maintained.

From the authorities cited, and the allegations in the complaint, it is very evident that if any grant, reservation, prescription, covenant, or agreement is here to be presumed in favor of the several proprietors and occupants, it must be of the roadway with the platform projecting over it, as it had existed and been used for many years. If each of such proprietors and occupants had such right of passage by virtue of some grant, reservation, prescription, covenant, or agreement, then of course such right extended, not only to their respective agents and servants, but to the customers of each having occasion to visit the rear of any of such lots on business with the occupants. In so far as the business of each proprietor or occupant invited customers over the roadway and under the platform to the rear of his place of business, his liability would probably be governed by the principle involved in *Corby v. Hill, Bennett v. L. & N. R. R. Co., Low v. Grand Trunk Railway Co., supra,* and cases of that nature.

But can we say by implication that one such occupant or proprietor holds out any invitation to any one to become a customer or dealer with some other occupant or proprietor? Each may be said to hold out an invitation to his own customers and dealers, but can he, in any sense, be said to invite people to become a customer or dealer of other occupants or proprietors whose places of business run back to the roadway? Invitations to become customers of others are sometimes in the negative instead of the affirmative form. Certainly there is nothing to indicate that the defendants ever in any way extended to the deceased any invitation to become a customer or dealer of theirs, or to have any contract or business relations with them whatever. It is a suffi-

cient answer to the questions above suggested that the deceased here was not at the time of the injury a customer or dealer with any one, much less with the defendants. The doctrine of invitation and concealed or sudden danger has no application, therefore, to the case before us. The deceased, at the time of the injury, was the servant, not of the defendants, but of Plankinton & Armour, and was in the act of driving along the roadway and under the platform by virtue of his employment. Assuming the right of passage, as above indicated, were the defendants, by virtue of their relations to Plankinton & Armour, under any duty or obligation to the deceased to either remove the platform or keep it guarded? Were they under any higher duty to him than they had been for a long time to Plankinton & Armour? The deceased, having entered the employment of Plankinton & Armour for the very purpose of hauling pork in barrels from the rear of their store along the roadway in question to the public streets, must not the injury be regarded as one of the hazards of the employment, so far as these defendants are concerned? *Naylor v. C. & N. W. Railway Co.*, 53 Wis., 661; *Howland v. M., L. S. & W. Railway Co.*, 54 Wis., 229; *Schadewald v. M., L. S. & W. Railway Co.*, 55 Wis., 577. True, it is alleged that he did not know of the projecting platform, but was it the duty of any one to inform him? If so, was it the duty of these defendants or his employers? Presumptively, Plankinton & Armour must long have known of the projecting platform. Were the defendants under any duty or obligation to inform them of a fact, the existence of which they long had known? Can it be that the defendants were under any higher duty or greater obligation to the deceased, with respect to the dangers of his employment, than they were to the persons who employed him?

It is true that fault and negligence in keeping and maintaining the platform is alleged; but, in the language of WILLES, J., in *Gautret v. Egerton, supra*, "to bring the case

within the category of actionable negligence, some wrongful act must be shown, or a breach of some positive duty. . . . What is it that a declaration of this sort should state in order to fulfil those conditions? It ought to state the facts upon which the supposed duty is founded, and the duty to the plaintiff with the breach of which the defendant is charged. It is not enough to show that the defendant has been guilty of negligence, without showing in what respect he was negligent, *and how he became bound to use care to prevent injury to others.*" The same rule prevails as to persons on the premises of another as mere licensees. *Sullivan v. Waters,* 14 Ir. C. L. R. (N. S.), 464; *Bolch v. Smith,* 8 Jur. (N. S.), 197; *Gallagher v. Humphery,* 10 Weekly Rep., 664; *Binks v. South Yorkshire Railway,* 3 Best & S., 244; *Hounsell v. Smyth,* 97 Eng. C. L., 731; *Wilkinson v. Fairrie,* 1 Hurl. & C., 633; *Collis v. Selden,* L. R., 3 C. P., 495; *Morgan v. Pennsylvania R. R. Co.,* 7 Fed. Rep., 78; *Vanderbeck v. Hendry,* 34 N. J. Law, 467.

In *Sullivan v. Waters, supra,* the court observed that the words " negligently and improperly " and " contrary to their duty," will not dispense with the necessity of setting forth the facts which show the duty.

In *Gallagher v. Humphery, supra,* there was an element of active negligence, but it was conceded by the late lord chief justice " that if the owner of the soil gives permission to any person to pass and repass over a particular way, he is not bound to do more than allow the enjoyment of such permissive right according to the circumstances in which such way exists; that he is not bound, for instance, if the way passes along the side of a dangerous ditch, or along the edge of a precipice, to fence off the road from the ditch or precipice. The only right acquired by such permission is to enjoy the permission granted of using the premises as they exist." The case thus supposed actually existed, and the rule thus stated was actually sanctioned in *Binks v. South Yorkshire*

*Railway, supra,* where the footway was near the tow-path of an unguarded canal.

In *Wilkinson v. Fairrie, supra,* the plaintiff was sent by his employer to fetch goods. The defendant's servant directed him along a dark passage-way to find the warehouse-man, and in going he fell down an unguarded stair-case and was injured, and it was held that there was no obligation to the plaintiff to light the passage-way or guard the stair-case, and hence there was no liability.

In *Vanderbeck v. Hendry, supra,* the plaintiff, a boy of about ten years of age, while passing along a gang or pas-sage-way in a lumber yard, and which was frequently used for passage by the public, near a public street in Jersey City, was injured by the falling of a pile of lumber, and it was held that "a mere permission to pass over dangerous lands, or an acquiescence in such passage for the benefit or con-venience of the licensee, creates no duty on the party giving such permission, except to refrain from acts wilfully injuri-ous. One who enjoys such permission is only relieved from being a trespasser, and must assume all the ordinary risks attached to the nature of the place or the business carried on."

The above discussion, except as to licensees, has been pred-icated upon the theory of an absolute right of passage along the roadway and under the platform in each of the several proprietors and occupants, and their agents and servants. But it is very doubtful whether any such right here existed. There is no allegation in the complaint indicating that there ever was any right by virtue of any prescription, grant, reservation, covenant, or agreement, except such, if any, as may be inferred from mere use and maintenance.

In *Thayer v. Jarvis, supra,* the use of the drive-way was quite similar, and it was held in effect that the facts sup-ported a finding that teamsters had *license* from each of the several occupants whose buildings abutted thereon, to use

the same for delivering goods at the stores of the others. There is nothing additional in the allegations here to indicate the existence of a prescription, grant, reservation, covenant, or agreement, except that the roadway had for many years been maintained by the several proprietors and occupants. That, however, would seem to be implied from such use by them. If this is so, then the deceased was at the time of the injury using the roadway as a mere licensee.

As a mere licensee, it is very evident, under the above authorities, that the defendants were under no duty or obligation to him to remove the platform, nor to warn him of its existence by lights or barriers. There is no allegation to indicate that the defendants had ever done or omitted to do anything to make the roadway more dangerous than it had been for many years.

There is nothing to indicate the existence of any sudden or concealed danger. There was no contract relation between the defendants and the deceased. His contract relation was with Plankinton & Armour. As to whether they were under any duty or obligation to inform him of the existence of the overhanging platform before he was, by virtue of their business and his employment, required to drive under it, is a question upon which we are not here called upon to express any opinion. It is obvious, however, that if there was any duty or obligation resting upon any one to so inform him of the nature and elevation of the structure before entering upon his employment, it was with those who so employed, rather than with those who had nothing to do with the employment, and probably knew nothing of it. There being no contract or other relation between the deceased and the defendants, there would seem to be no duty or obligation resting upon them to give such information merely because Plankinton & Armour had engaged his services in hauling pork along the roadway over the premises occupied by the defendants, as they and their

former agents and servants had done for many years. Such being the relation of the parties to each other and to the roadway, and the law being as indicated by the authorities cited, and the obstruction complained of having existed in the same condition for many years, over land occupied by the defendants, there would seem to be no error in the record.

ORTON, J.   I most respectfully dissent from the majority opinion in this case.   The owner of the several buildings and warehouses owned the ground in the rear of the same, next to the river, in severalty, and by an agreement between themselves have for many years maintained and used a roadway along and across the same in connection with a public alley and public streets leading to and away from the same, for the access to and egress from the same of teams and wagons, in the appropriate business of each.   This unquestionably made this open ground the *private* way of each one of the proprietors for such purpose, and created in each a private easement in the same.   In such a case the law is perfectly well settled that these several proprietors took their right and use of this roadway subject to any obstruction, either natural or artificial, existing therein at the time of such dedication, on the premises of either one of them, and there was no obligation or duty resting upon any one of them to remove such obstruction, however dangerous or inconvenient to the others.   They all had, or are presumed to have had, notice of such obstruction, and if · its removal was desired it could have been provided for at the time.   They must, therefore regulate and enjoy such joint use in view of the same. In this there is no hardship or possible wrong, and all of the authorities which are cited to sustain this demurrer have application *only* to such a case.

But the complaint makes a case very different from this. The language in respect to the dedication of this roadway

is, "thus at all times affording to said occupants and proprietors, their agents and servants, *and to the public in general,* access for teams and wagons to the rear ends of all the various buildings situated on said half-block, and also a passage along such dock-line of said river to said West Water street," etc. The deceased was driving a wagon loaded with barrels of pork, and was sitting on one of the barrels, which was a perfectly proper place for him to sit and drive such a load, and he was on the way from the alley into the open ground just at the rear of the defendants' building or warehouse to the pork warehouse of another of the proprietors. It was in the night-time, and quite dark. He drove with due care. He was not aware that this roof, shed, or elevated platform existed over such roadway at the defendants' building. He had never driven there before, and had no notice of it. His business was legitimate and proper, and required the use of the roadway unobstructed for his team and loaded wagon,— the very use for which it was intended. That shed or platform had been dangerous for a long time to any one situated as he then was, to the knowledge of the defendants. His head came into contact with it, and he was thereby killed without his fault.

This roadway was for the use of "the public in general," as well as of the proprietors, in connection with a public alley and public streets for such purposes. It was necessary that the public should have access to such buildings for the appropriate business of each. The plaintiff was one of that public. He had a right there by virtue of this dedication, and his attempted use of the roadway was proper. What does the law call this right of the public, and the roadway in connection with such public use? Is there any name for it? Does it involve any public right which the law can recognize? It is said it is not a highway like one of the streets of a city, or road in a town, which is required to be kept in repair by the public authorities. Probably not. It

is not a *private* way, and it is a way for the use of the public. May it not be called a *public* way without doing violence to language or law? It must be a public way for the use of the public in general; that is, the public having a use for it. To this extent — that is, so far as the defendants who dedicated it to such public use, and the plaintiff, as one of the public wishing to enjoy such use, are concerned — may it not be called a highway? It was to be used in connection with other highways, and in the same manner. By the dedication to the public of this ground, and its long use as a private and also as a *public* roadway, were not the public notified, yes, and *invited*, to use the same, and *assured* that it was safe for such purpose? But it is said the public were not so "invited." The defendants never issued cards of invitation, or published an invitation in the newspapers or hand-bills, or wrote letters of invitation to the public to come and use the way, it is true. Its dedication to the public use was *invitation* enough.

The defendants maintained a dangerous nuisance in this way of which the public was not apprised, and which they had no reason to suppose existed. They maintained a *trap* in the way. They virtually, by the dedication to such use, said to the public, notified the public, that there was no such shed or roof existing at their building just high enough to take the heads of the unsuspecting and unnotified public using the way in the night-time off from their shoulders. Can it be possible that by such dedication the defendants owed no duty, were under no obligation, to the public to remove such a dangerous obstruction from the way, or raise it above the heads of those for whose use it was intended? The very principle which underlies the relation of cities and towns to the highways and the public, of liability to the public, or of obligation or duty to the public, is boldly present in this relation between the defendants, this roadway, and the public, so far as to require them to remove such a

dangerous obstruction,— to remove the *trap* or *pitfall* or impending shed which they had placed there. Whether they placed it there before or after such a dedication, so far as the danger to the public or their obligation to the public is concerned, it makes no difference. In morals and law their duty would be precisely the same in either case; but, of course, not to the other joint proprietors who made the dedication and had notice of existing obstructions. It is bad policy as well as wrong to underestimate public obligations, or duty to the public, where, as here, property owners and business men voluntarily place themselves in such a relation to the public that there is death or great danger in attempting to use what was intended as a valuable convenience and favor by them to the public without any known restriction or condition.. If this complaint is true, and on demurrer it must be assumed to be true, these defendants have known for many years that whenever one of the· public attempted to use this roadway as used by the deceased, in the night-time, that there was certain death or great danger in so doing, and that any one almost any night in the proper season was liable to make such an attempted use of the way; and yet we are told there was no obligation or duty resting upon them either to give such notice that all of the public might know of the danger, or to remove it.

The following language of Chief Justice Cockburn·in *Corby v. Hill*, 93 Eng. C. L., 556, is perfectly applicable to this case, and no criticism or refinement can make it otherwise: "The proprietors of the soil held out an *allurement* whereby the plaintiff was induced to come upon the place in question. They held out this road to all persons having occasion to proceed to the asylum as the means of access thereto. Could *they* have justified the placing an obstruction across the way, whereby an injury was occasioned to one using the way by their *invitation?* Clearly they could not." No distinction was ever made, where the rights of the unnotified public were concerned, as to liability, whether the obstruction was

permitted to remain there or was placed there. In the one case there is alone the duty to remove it, and in the other the violation of duty in placing it there, coupled with the duty to remove it. The grounds of liability are precisely the same in both cases; for in both there is the *fault* of the proprietor, the allurement and invitation, the want of notice to the public, due care, and injury or death as the consequence.

The case of *Low v. Grand Trunk Railway Co.*, 72 Me., 313, is precisely in point as to facts and principle. The court said, in that case: " In fitting up a place for business purposes one is at liberty to consult his own convenience and profit, but not without a reasonable regard for the safety of those whom his operations *bring* upon his premises upon lawful business errands. In particular, anything which may operate as a *trap* or a *pitfall* for those not familiar with the place or moving in a dim light is to be avoided, if reasonable care will accomplish security to life and limb in that respect."

There are many other cases in point in the brief of respondents' counsel, and many not cited. Indeed, it may be safely challenged that no respectable case can be found involving substantially the same facts, wherein the duty and liability of the proprietor to one of the public in such a case are even questioned. It is of no use to cite cases having no bearing upon the-real question here, however numerous they may be, or suppose a great multitude of cases of no possible analogous relevancy to this, and discuss the law applicable to them.

I feel the more interest in this case because I cannot but think that the principle upon which it is based is very important and well established both by reason and authority, and that legal justice may be impaired by its repudiation, and the manifestation of undue zeal in its discussion may be excused on the ground of strong conviction.

I think the complaint states a cause of action.

*By the Court.*— The order of the circuit court is affirmed.