FOSTER LUMBER CO. v. RODGERS et al.*
(No. 74.)

(Court of Civil Appeals of Texas. Beaumont. March 2, 1916. On Motion for Rehearing, March 23, 1916.)

1. NEGLIGENCE ☞32(2)—DUTY TO USE ORDINARY CARE—"INVITEE"—"LICENSEE."

Defendant F. furnished ties to defendant K. under a contract, the ties to be paid for only after inspection. F. knew that they were then sold to the defendant G. Plaintiff, G.'s tie inspector, came monthly to inspect ties, which were piled along its tramway by F., in K.'s motor car operated by its employé. F.'s superintendent accompanied them in the motor car and indicated the ties to be inspected. Plaintiff made reports in triplicate, one for each defendant, and on these reports both F. and K. were paid. No specific agreement existed for the use of the tramway, but plaintiff had made over 20 trips with F.'s superintendent and with its knowledge and without objection. Plaintiff was injured in an accident to the motor car caused by the defective condition of the tramway. Held, that the defendants had a mutual interest in the plaintiff's work, he was an "invitee," and defendant F. was bound to use ordinary care to keep its tramway in a reasonably safe condition, since, while one who goes on the premises of another for his own convenience, even by permission, is a "licensee," and the owner owes him no duty other than not to willfully or maliciously injure him, one who goes upon the premises of another by invitation of the owner, either express or implied, in the performance of work to the mutual interest of both, is an invitee, and the owner owes him the duty to keep such premises in a reasonably safe condition for his use while performing the work (citing Words and Phrases, Second Series, Invitation; see, also, License.)

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 43; Dec. Dig. ☞32(2).]

2. APPEAL AND ERROR ☞742(1) — BRIEFS—STATEMENT OF EVIDENCE.

Under the rules of the court and by statute if the appellant's brief does not set forth the substantial matter referred to in each assignment of error, and contains mere references to pages of the record, the appellate court cannot consider the assignment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. ☞742(1).]

3. APPEAL AND ERROR ☞1004(1)—VERDICTS—EXCESSIVE DAMAGES—PREJUDICE OF JURY.

As the assessment of damages is a prerogative belonging peculiarly to the jury, a finding will not be disturbed as excessive, unless the record discloses that the jury has abused its authority or has been unduly influenced in some manner, and the amount is clearly excessive.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3944, 3946; Dec. Dig. ☞1004(1).]

4. APPEAL AND ERROR ☞1126—MOTION FOR DISMISSAL—APPEAL NOT PERFECTED.

Where no appeal is perfected against a defendant, a judgment in its favor will be affirmed upon its motion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3144, 4429–4431; Dec. Dig. ☞1126.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Action by J. B. Rodgers against the Foster Lumber Company and others. From a judgment for the plaintiff, the named defendant appeals. Affirmed.

N. C. Abbott, of Houston, and W. W. Dies, of Kountze, for appellant. Smith, Crawford & Sonfield and Howth & Adams, all of Beaumont, for appellee.

MIDDLEBROOK, J. This cause was brought in the district court of Hardin county, Tex., by J. B. Rodgers, against the Foster Lumber Company, the Kirby Lumber Company, and Gulf, Colorado & Santa Fé Railway Company, for damages caused by motor car wrecked, which was the result of spreading of rails, in consequence of bad ties. The motor car was the property of the Kirby Lumber Company, and was operated by one of its employés. Plaintiff, J. B. Rodgers, was a tie inspector for the Gulf, Colorado & Santa Fé Railway Company, and was out inspecting ties when the injury occurred. The Foster Lumber Company was furnishing ties to the Kirby Lumber Company by virtue of contractual relations between them, and the Kirby Lumber Company was selling the ties to the Gulf, Colorado & Santa Fé Railway Company, on contract between them, and the Foster Lumber Company knew such was the case.

The railroad on which plaintiff was traveling at the time he was injured was a tramroad, and was owned by the Foster Lumber Company. It was being used but little by the Foster Lumber Company at the time of the accident; but the company's locomotive and cars were still being operated over the road and during the months of February, March, April, and May, 1913, 216,000 feet of logs were hauled over the track from points beyond the point where the injury occurred, and from April 14, to April 22, 1913, the company hauled logs and ties over the

road every day. The locomotive used by the Foster Lumber Company on this road weighed 60 tons. The tramroad was built in 1909, and was originally intended to be a common carrier; and there were no other tramroads in that locality built like that one.

Under its contract with the Kirby Lumber Company, the Foster Lumber Company manufactured hewn railroad cross-ties in the woods, and hauled them out and distributed them along the tramroad for inspection, and the Gulf, Colorado & Santa Fé Railway Company would send an inspector out each month to inspect and take up the ties. The Kirby Lumber Company would send the inspectors out to the ties in its motor car, and it had the privilege to operate its motor car over the tracks of the Gulf, Colorado & Santa Fé Railway Company for that purpose.

When the inspection trips were made, the Foster Lumber Company would be notified when the inspector would arrive, and the Foster Lumber Company would have its superintendent of the tie department meet the motor car and he would get on the motor car with the inspector of the Kirby Lumber Company, and the inspector of the Gulf, Colorado & Santa Fé Railway Company, and the operators of the motor car, and they, together, would travel over the line of the tramroad of the Foster Lumber Company to such places as the Foster Lumber Company's tie superintendent would direct, and inspect the ties piled on the right of way that he pointed out. It was a part of the contract with the Kirby Lumber Company that the ties were to be inspected before the Foster Lumber Company could receive pay for them, and monthly inspections were made.

J. B. Rodgers, appellee, was in the employ of the Gulf, Colorado & Santa Fé Railway Company, and before the accident occurred, had made about 20 to 23 trips over the tramroad to inspect ties pointed out by the Foster Lumber Company, and an agent of the Foster Lumber Company accompanied each trip. J. B. Rodgers, tie inspector, made reports of his inspection to the Gulf, Colorado & Santa Fé Railway Company, to the Kirby Lumber Company, and to the Foster Lumber Company, and upon these reports of inspection by Rodgers, the Kirby Lumber Company and Foster Lumber Company each got pay for the ties. It made no difference to the Foster Lumber Company who inspected the ties, just so it got its money.

There is evidence of express invitation by the Foster Lumber Company to Rodgers to go upon its track; but the preponderance of the evidence is to the effect that no specific agreement existed between the Foster Lumber Company and either of the other defendants for the use of the tramroad by them. The Foster Lumber Company, however, knew of the use of its tramroad for the inspection of the ties, as it was used at the time of the accident, since the beginning of its contract with the Kirby Lumber Company, and never objected to such use. The Foster Lumber Company could have taken the tie inspector out on the tramroad with its locomotive, but did not do so, and the gasoline motor car was a better and more economical way of getting out to the ties to inspect them, and was much lighter on the track than the locomotive.

The trial court instructed a verdict for the Gulf, Colorado & Santa Fé Railway Company and for the Kirby Lumber Company, and submitted the case to the jury as to the plaintiff and defendant Foster Lumber Company, resulting in a verdict and judgment in favor of plaintiff, J. B. Rodgers, in the sum of $7,500.

The record of the case is quite lengthy, but the above brief statement is sufficient for a full understanding of the issues presented to us, except as we may hereinafter state, in passing upon specific issues. Appellant's first five assignments of error are grouped, and presented in conjunction, and are substantially:

(1) The evidence is insufficient to sustain the verdict of the jury and judgment of the court, as it does not show that the defendant Foster Lumber Company owed plaintiff the duty of keeping its tramroad in a safe condition, or that it was obligated to use ordinary care, or any kind, for the protection of plaintiff against injury while on its tramroad, under the circumstances and at the time shown by the evidence.

(2) The verdict of the jury and judgment is not supported by the evidence, because there was no contract for the use of the tramroad between the Kirby Lumber Company and the Foster Lumber Company, and therefore plaintiff assumed the risk incident to going upon the road.

(3) The third assignment is substantially the same as the second.

(4) The fourth assignment is like the second and third, with the addition that no liability attached by reason of the fact of acquiescence in or permission to use the tramroad by the Foster Lumber Company.

(5) The trial court erred in refusing to give to the jury special requested charge No. 1, asked for by defendant Foster Lumber Company, as follows:

"The jury are instructed that under all of the evidence adduced on the trial of this case, the defendant Foster Lumber Company is not liable to the plaintiff for any damages he may have suffered because of the injury alleged in his petition, and shown by the evidence, and your verdict should be for the defendant Foster Lumber Company, and you will so find."

Each of the assignments of error is presented as a proposition, and seven other propositions are presented under the five assignments, which, briefly stated, are:

(1) There being no contractual relation between the Foster Lumber Company and the Gulf, Colorado & Santa Fé Railway Company, no contract obligation would rest on Foster Lumber Company to furnish a safe, or

any, means of transportation for the plaintiff, an employé of the railway company for the inspection of ties, and if he assumed to go on the tramroad of Foster Lumber Company, without such invitation as would impose a duty, it would be at his own risk, and if injured he could not recover of Foster Lumber Company, in the absence of affirmative or active negligence.

(2) There being no contract between the Foster Lumber Company and the Kirby Lumber Company, specifying manner and means of inspection, no obligation would attach to the Foster Lumber Company to furnish safe means of transportation to plaintiff, even though plaintiff be an employé of Kirby Lumber Company, without such invitation as would impose a duty.

(3) The third proposition is practically the same as the second, except that if the Kirby Lumber Company assumed to use the tramroad of the Foster Lumber Company for transportation of plaintiff for such inspections, without such invitation as would impose a duty, and plaintiff went thereon in the motor car of said Kirby Lumber Company, and while so using said tramroad suffered an injury, the Foster Lumber Company would not be responsible therefor.

(4) In the absence of contractual relation between Foster Lumber Company and Kirby Lumber Company, Gulf, Colorado & Sante Fé Railway Company, or plaintiff, permission to use its tramroad growing out of no greater authority than the failure to object to such use, would not create a liability to compensation for the suffering of plaintiff while passing over said tramroad at his own or at the instance of the Kirby Lumber Company, or the railway company, or the employé of either.

(5) The remote interest which the Foster Lumber Company might have in the inspection of ties it sold to Kirby Lumber Company, in the absence of any contract covering the means or manner of their inspection, is insufficient to create an obligation on the part of the Foster Lumber Company to use ordinary or any other degree of care in protecting plaintiff, an employé of the railway company, or the employé of Kirby Lumber Company, if so held, while passing over its tramroad with no other authority than that which grows out of its permission, and it would not be liable for injuries, in the absence of affirmative or active negligence.

(6) The evidence in the case does not justify the submission to the jury of the question whether plaintiff was an invitee, either express or implied, of the Foster Lumber Company, on its tramroad at the time of the accident, nor is the evidence sufficient to justify the submission to the jury of the question whether plaintiff was on said tramroad acting for the advantage, profit, or benefit of the Foster Lumber Company on the trip when the accident occurred.

(7) The circumstances under which the plaintiff was on the tramroad of the Foster Lumber Company at the time of the accident showed that the Foster Lumber Company owed him no duty, and was under no obligations to him to keep the tramroad in repair, or in a safe condition, nor does the evidence show any controverted question of fact on that subject.

The following authorities are presented by appellant, in support of these propositions: City of Greenville v. Pitts, 102 Tex. 1, 107 S. W. 50, 14 L. R. A. (N. S.) 979, 132 Am. St. Rep. 843; Blossom Oil & Cotton Co. v. Poteet, 104 Tex. 230, 136 S. W. 432, 35 L. R. A. (N. S.) 449; Mack v. H. E. & W. T. Ry. Co., 134 S. W. 846; Kirby Lbr. Co. v. Gresham, 151 S. W. 847; Railway Co. v. Brown, 11 Tex. Civ. App. 503, 33 S. W. 146, writ of error denied 93 Tex. 673, 33 S. W. xvii; Louthian v. Ft. Worth & D. C. Ry. Co., 50 Tex. Civ. App. 613, 111 S. W. 665; Hall v. H. & T. C. Ry. Co., 125 S. W. 946; St. Louis Southwestern Ry. Co. v. Anderson, 125 S. W. 628; Southwestern P. Cement Co. v. Bustillos, 169 S. W. 638; St. Louis So. Ry. Co. v. Bolthrop, 167 S. W. 246; Indian Refining Co. v. Mobley, 134 Ky. 822, 121 S. W. 657, 24 L. R. A. (N. S.) 497; Hamilton v. Minn. Desk Co., 78 Minn. 3, 80 N. W. 693, 79 Am. St. Rep. 350; Muench v. Heinemann, 119 Wis. 441, 96 N. W. 800; Huebner v. Hammond, 177 N. Y. 537, 69 N. E. 1124; Ky. Dis. & W. Co. v. Leonard (Ky.) 79 S. W. 281; Glaser v. Rothschild, 106 Mo. App. 418, 80 S. W. 332; St. Joseph Ice Co. v. Bertch, 33 Ind. App. 491, 71 N. E. 56; Briscoe v. Henderson L. & P. Co., 148 N. C. 396, 62 S. E. 600, 19 L. R. A. (N. S.) 1116.

The two cases reported in the Northwestern Reporters are to the effect that no liability exists without mutuality of interest. In the case of Muench v. Heinemann, 119 Wis. 441, 96 N. W. 802, Justice Winslow says:

"The main question in the case, however, is whether, under the facts testified to by the plaintiff himself, and found by the jury, there is any liability shown; and this depends upon the question whether, under those facts, the plaintiff was a mere licensee, or one who was upon the premises by invitation, express or implied. If he was a mere licensee, there can be no recovery, because a mere licensee takes the premises as he finds them, and the licensor owes him no duty, save to refrain from * * * active negligence rendering the premises dangerous [citing Cahill v. Layton, 57 Wis. 600, 16 N. W. 1, 46 Am. St. Rep. 46]. If, on the other hand, he was more than a mere licensee, and was on the premises by invitation, express or implied, the defendant owed him the duty of exercising ordinary care to keep the premises in safe condition for use by persons themselves exercising ordinary care [citing Gorr v. Mittlestaedt, 96 Wis. 296, 71 N. W. 656]. Mere permission or license does not imply invitation. When that fact alone appears, the permitted person is a mere licensee; but when it is shown that the permitted person enters on the premises in the ordinary way to transact business with the licensor, or that the object of his visit is one in which there is mutuality of interest between licensor and licensee, then the permitted person ceases to be a mere licensee, and becomes not only a licensee, but an invited person, to whom the duty of exercising ordinary care is

owing [citing Hupfer v. Nat. D. Co., 114 Wis. 279, 90 N. W. 191]."

In Huebner v. Hammond, 177 N. Y. 537, 69 N. E. 1124, there is not sufficient statement of the case to tell whether it is applicable to the instant case. The opinion is:

"Judgment affirmed, with costs, on the ground that there was no proof of negligence to submit to the jury."

In St. Joseph Ice Co. v. Bertch, 33 Ind. App. 491, 71 N. E. 56, the court says:

"It does not appear that the boathouse was placed upon the premises under any contract, invitation, or permission to which the appellants were parties; and, if any duty on their part to exercise care with reference to the boathouse existed, it must be based on some other reasons. If such damages occur to the owner of neighboring land, or to one occupying such land in the accomplishment of some lawful purpose by agreement with the owner (as in Lynds v. Clark, supra), the proprietor whose structure, by reason of its insecurity, has caused the damage, will be held to have been bound to exercise reasonable care and skill, both in the original construction and in the inspection and the repairing of such structure; but this rule cannot be applied here in the determination of the question as to the sufficiency of * * * demurrer, for the facts which would make it applicable are not sufficiently stated."

Of course, this case went out on a general demurrer to the petition. The case referred to in the notation as Lynds v. Clark, supra, is Lynds v. Clark, 14 Mo. App. 74.

We have quoted from the two cases above, which are cited by the appellant, as fair examples of the authorities cited by them.

All of the cases cited by appellant are distinguishable from this case in one of two ways, i. e.: There was not sufficient pleading to charge the defendant with duty to a trespasser or licensee, or that no mutuality of interest existed between plaintiff and defendant.

In the instant case, plaintiff pleads elaborately, interest of all parties in the work being performed by him, and invitation and acquiescence in his traveling over the tramroad in the motor car, as he did; in fact the pleadings are so full and exhaustive that no exception was seriously urged to them.

Mr. F. J. Womack testified: That he represented the interests of the Foster Lumber Company in Texas. That the contract with the Kirby Lumber Company was verbal. That he made a contract with the Kirby Lumber Company to furnish it with hewn ties, which the Foster Lumber Company was to stack on the right of way of the Foster Lumber Company tram, wherever it happened to have a track, and they were to pay the Foster Lumber Company so much a tie for the ties. That the Kirby Lumber Company was to furnish the Foster Lumber Company with specifications by which to make the ties, and the Kirby Lumber Company was to have them inspected once a month. That there was nothing in the contract with reference to the manner of inspection or how it was to be done, or by whom. That it did not concern the Foster Lumber Company who

inspected them, as long as the Kirby Lumber Company had them inspected. That the Foster Lumber Company did not know the Santa Fé at all. That it was trading with the Kirby Lumber Company, and it made no difference who McNeely (agent of Kirby Lumber Company) sent out. Nothing was said about furnishing of transportation or means of transportation for inspecting. Mr. McNeely was to furnish the tie cars to move the ties from the right of way. That the Foster Lumber Company had nothing to do with the inspection of the ties at all. That the Foster Lumber Company employed tie makers to go out in the woods and hew the ties out, and employed other men with wagons to haul them up to the right of way. That in pursuance with the agreement with McNeely, the Foster Lumber Company went ahead and furnished ties and inspected them on the right of way, and when the Kirby Lumber Company brought the car out they let them load the ties and the Foster Lumber Company took its locomotive and pulled them up to the railroad company's line. That when the inspections were made by the railroad company, a representative of the Foster Lumber Company accompanied the party that made the inspection. That the Foster Lumber Company's agent, who accompanied the inspecting party, was Mr. Hamblen. That the Foster Lumber Company was interested in the inspection to the extent that the Kirby Lumber Company had agreed to inspect these ties, and, of course, they wanted them inspected, but supposed if they had not done so, the Foster Lumber Company would have been in the same position. That the Foster Lumber Company put out the ties under the instructions of the Kirby Lumber Company.

He testified further on cross-examination:

"We were furnishing the Kirby Lumber Company ties from some time in 1911 up to the time of the accident. During that time I was part of the time at Houston and part of the time at the mill. I have never been there while they were inspecting ties. The only time I was out there was while they were loading ties after they had been inspected. The Kirby Lumber Company furnished the locomotive and our engineer operated the locomotive and hauled the ties over the track and then turned them over to the Santa Fé. We were not using this track (on which plaintiff was hurt) all the time. Just prior to the time we had not used the track for loading except just occasionally. About once a month it was necessary for us to use it for loading ties out of there. When we needed the track we needed it mighty bad, but if we had not had the track we would have put the ties somewhere else. We did put the ties along that track and we wanted to preserve that track. Mr. Hamblen is here to speak for himself as to whether he knew they were using that motor car on that track. He was supposed to go along. I never refused permission to the Santa Fé or Kirby Lumber Company to use the motor car on this track; I was never asked. In a way the Foster Lumber Company was interested in the inspection of the ties. The contract called for the inspection of the ties. I guess the contract could have been performed without the inspection of the ties. I heard while the ties were being taken up there that the Kirby Lumber Company was re-selling them to the Santa Fé.

Our contract provided that the ties were to be inspected by the Kirby Lumber Company once a month. They were to inspect the ties right on the ground where they were stacked. I suppose the most convenient way of getting from place to place on that track was to take the locomotive. And in answering the question as to which would be, I suppose it is true that with four or five men going along to inspect the ties, the most economical and quickest way would be by gasoline-propelled vehicle. It is cheaper to run than a locomotive. I suppose the locomotive is more likely to break down a rotten track than a motor is. The locomotive is heavier. I believe I said I was interested in having those ties inspected. I was interested. I got my money after the inspection of the ties: my contract called for that. In a general way, if there was delay in the inspection, it would delay us in getting our money. The contract was to inspect the ties once a month. We could not have settled with the tie makers without inspection of the ties. Our contract called for them to make the ties in accordance with the specifications. The ties had to be inspected before we could get our money. We contracted to have them inspected. The Kirby Lumber Company was supposed to inspect them and contracted to do it, and I was interested in having them do it, and contracted to have them do it. To a certain extent, I had a financial interest in the proper inspection of the ties."

E. C. Smith, manager of Foster Lumber Company mill, testified: That he did not know whether it would be deemed a delivery of those ties under their contract with the Kirby Lumber Company when they were inspected, or when they loaded them. That he supposed it would be deemed a delivery on inspection, because they would get their report on them then. That they got a report on ties each month that they were inspected. That they got their report from Mr. Hamblen and would get a copy of the report from the inspector. That they knew it was the custom of the Kirby Lumber Company to go out in a motor car to inspect the ties, and that he knew that they ran over the Foster Lumber Company's track. That he knew all the time before the accident, during the time they had been furnishing ties to the Kirby Lumber Company, that the inspector and the checker were coming on that motor car over their track for the purpose of inspecting the ties. That he knew they had been coming over that track for this purpose for about two years before the accident, and that after the accident they did not prohibit those men from coming back over there and inspecting ties, and that they could have stopped them from coming over their track in the motor car had they desired to do so. That they had no reason to stop them. That he was manager of the company and knew the ties had to be inspected, and that the company would not get its money until after the inspection, and sometimes not then. That he guessed the company expected them to come and inspect the ties, and in a way he would think the company was interested and had them come and inspect the ties. That that was the custom for them to come and inspect the ties, and that they knew the ties were going to be inspected, and loaded out, and that if they had not come to inspect them once a month they would have been inquiring what was the reason. That they stacked the ties along the tramroad for the Kirby Lumber Company, to enable them to load them out on the cars and for them to be hauled over the tramroad, in order that they might be conveniently inspected. That he knew the inspector would not go out in the woods where the tie makers were at work and inspect the ties. That they put them along the railroad for the purpose of enabling the inspector to get at them conveniently.

"We put the ties out there expecting they would come, and they did come. We put the ties out there for the purpose of being inspected. We knew we were not going to get our money until they were inspected. I knew they were coming on the motor car. * * * I knew when the inspections were made that the Kirby Lumber Company had a man to run the car and I knew we were likely to have a representative on the car. We generally had a man on the job as inspector. Our man, Hamblen, was the man that went on those inspection tours. Mr. Hamblen usually met the motor car at Cleveland or Fostoria and made the trip with them. We generally knew about when the car was ready to make the trip; they would notify him. Mr. Hamblen was on the car the day it was wrecked. He is here in court. It was a custom and habit to meet this motor car and the motor car would carry them over the line and he would show them the ties."

J. G. Hamblen testified: That he had been in the employ of the Foster Lumber Company 15 years, and was employed in the tie department in 1913, and that it was his duty to have the ties made and to put them on the road. He knew a contract existed between the Foster Lumber Company and the Kirby Lumber Company for the making of ties during the period mentioned, and that he generally went with the man who inspected the ties, who generally came once a month. That he accompanied the inspections that took place in 1913 on the Foster Lumber Company's tram between Fostoria and Midline, and that Rodgers, Matthews, Winters, Sparks, and himself made the trip together. That they went on the motor car, and that he got information that the car was coming from notice of the Kirby Lumber Company tie checker. That he understood that Rodgers was the inspector for the Santa Fé Company. He knew that he claimed to be the Santa Fé inspector. That he put the ties on the right of way because it was according to the contract the Foster Lumber Company had with the Kirby Lumber Company. That the purpose of stacking them along the right of way was to enable the purchaser to come there and inspect them, and that he knew it had been the custom to come in the motor car. That he had been notified that they would be along the railroad on this motor car. That he knew they were coming along that tram track on the motor car to inspect the ties that were stacked along the track. The motorman would ask him where he had ties, and he would

tell the motorman. That the ties were put along the track under his supervision, and that it was his understanding that Mr. Rodgers was there to inspect the ties.

W. P. Matthews testified: That he was on the car the day Rodgers was injured, and Mr. Hamblen, the Foster Lumber Company's inspector, showed them around where the ties were to be found. That he had not gone over that track without his being along with him to show him where to go. That he never went over that track without a representative of the Foster Lumber Company. That he was checker for the Kirby Lumber Company, and that it never happened while he was checker that Mr. Hamblen or some other representative of the Foster Lumber Company was not along, and that he checked there four months.

J. B. Rodgers, appellee, testified: That he was tie checker for the Gulf, Colorado & Santa Fé Railway Company. That he made his first trip in October or November, 1911. That he rode over the road of the Foster Lumber Company up around Fostoria. That the accident occurred in February, 1913. That he was over that road every month once a month. That he would run out there and make inspections. That the accident occurred after they had made the inspection for that trip. That they had made the inspection. That he had passed over the road before the accident occurred, and that the rails had not sprung, or at least had not spread sufficient to cause the car to go in the ditch. That he had run over that track once a month for 22 or 23 months, and that he did not operate the car on the date of the accident, but a Mr. Sparks operated it. That Mr. Sparks was motorman for the Kirby Lumber Company. That he went down to inspect the ties at the instance and request of the Kirby Lumber Company, and that all he knew was that it was customary for him to get on the car and ride out when these inspections were made.

Sparks, the motorman of the car, testified: That he was hired by the Kirby Lumber Company to run the inspection car, and by virtue of their authority he ran over the particular track. That a representative of the Foster Lumber Company met them and they took him over the track. That the Kirby Lumber Company furnished the car, but that the representative of the Foster Lumber Company directed them over the track, and invited them on the track. That he was there at his invitation and by his consent, and performed the duty of inspecting ties for the benefit of this company, among others. The representative of the Foster Lumber Company told him where to stop and what ties to inspect, and directed his movements. That the gentleman who represented the Foster Lumber Company would flag him down whenever he wanted them to inspect ties. That he was working under his orders, in a way. That he never objected to his going on that track. That he knew he was doing it. That it had been customary with them to run that car on that track to inspect ties. That he did not know whether the Foster Lumber Company could have gotten those ties inspected in any other way or not. That it was most convenient and the quickest way to inspect them, and that they joined in with them to inspect them that way and had their representative along on these trips. That they always had a representative along at all times.

[1] Under these facts, it is clear and undisputed that Rodgers had been over the appellant's tramroad many times for the same purpose and in the same capacity he was acting when he was injured. The Foster Lumber Company knew this and its agent accompanied him on these trips. The undertaking was mutual and for the benefit of all the parties. Such being true, the Foster Lumber Company was under further obligations to Rodgers than to a trespasser or a mere licensee. It was under obligations to him to use ordinary care to keep its railroad in a reasonably safe condition for him to pass over when performing the work.

It was necessary for the ties to be inspected before appellant could get pay for them. The ties were placed along the tram by the appellant to be inspected. These inspections had been going on, under the conditions, for two years. Each time the motor car went over the track, a representative of appellant was on it, and directed its movements. The Gulf, Colorado & Santa Fé Railway Company's agent, after inspecting the ties, made triplicate reports, one for the appellant, one for the Kirby Lumber Company, and one for his own company, and upon these reports appellant received its money.

Under these facts, can it be said, the inspector was a trespasser or mere licensee? We think not. It is true that the contract did not designate who the inspector should be, nor how he was to get to the ties to inspect them; but it did provide for an inspection, and the inspection was to be performed by some one chosen by the Kirby Lumber Company, and the fact that the Foster Lumber Company piled the ties on its tram for inspection and knew that the Kirby Lumber Company was selling the ties to the Gulf, Colorado & Santa Fé Railway Company, and the Gulf, Colorado & Santa Fé Railway Company's inspector was doing the work of inspection, and had been so inspecting for 2 years, would be sufficient to warrant a finding that Rodgers was an invitee; but when, in addition to these pertinent facts, it is shown that the appellant always had its agent on the motor car on these inspection trips and directed the motorman where to go and where to stop, we think such facts fix the status of Rodgers as an invitee working to a common purpose for the benefit of all parties concerned, and un-

der such conditions, the appellant was bound to use ordinary care to keep its tramroad in a reasonably safe condition for the motor car to pass over. Such being the case, Rodgers was on the tramroad not only by permission or acquiescence, but as an invitee, and did not assume the risk of injury incident to the negligence of the appellant in maintaining a defective road.

While the contract did not provide who the inspector was to be, yet it did provide for inspection, and the inspection had to take place before appellant could receive any pay for its ties; therefore inspection was not only incident to but a part of the contract, and Rodgers, in performing the inspection, was doing a work incident to the contract and for the benefit of all of the parties concerned; therefore the Foster Lumber Company had mutual interest in the work Rodgers was doing, and owed him the duty of ordinary care to keep its track in a reasonably safe condition for him to pass over to perform this work.

It follows from what has already been said that it would have been error for the trial court to have given appellant's first requested instruction.

The difference between a licensee and an invitee has taxed the capacity of the best legal talent, both text and opinion writers. However, under a statement of facts as in the present case, authors are almost, if not unanimously, agreed.

In Plummer v. Dill, 156 Mass. 426, 31 N. E. 128, 32 Am. St. Rep. 463, the Supreme Court of that state fixes the rule thus: One who goes on the premises of another for his own convenience, or pleasure, or matters which concern him alone, even though by permission of the owner of the premises, is a licensee and the owner of the premises owes him no duty other than to not willfully or maliciously injure him; but one who goes upon the premises of another by the invitation of the owner of the premises, either express or implied, in the performance of work mutual to the interest of the person going upon the premises, the owner of the premises owes him the duty of keeping such premises in a reasonably safe condition for his use while performing such work. See, also, authorities cited in this case.

Mr. Street, in his splendid work on Personal Injury (page 178, § 104), states the rule thus:

"It may be stated generally that it is the duty of the owner, occupier, or controller of premises to use due or reasonable care for the safety of persons present by his actual or implied invitation, such as a person of reasonable or ordinary prudence would use under the circumstances; this duty extends to reasonably safe guidance or caution against injury from things dangerous in themselves, as open and unguarded trapdoors, elevator shafts, chutes, excavations, and blasting, and to things dangerous in their use, such as machinery in operation, to prevent unnecessary or unreasonable exposure to danger. Customers having business with the owner or occupier, workmen, or third persons lawfully using the dock warehouse and railroad yards and appliances provided by the owner or occupier, are present by implied invitation, and while using the premises in the usual way and at reasonable hours, the duty stated is owing to them by the owner, occupier, or controller. Where an injury is caused by machinery on defendant's private premises, the existence of a duty to exercise care depends on the owner's or occupier's express or implied invitation to the injured party to enter on the premises. Whether such duty is owing to mere visitors in ordinary social intercourse, would probably depend upon whether they could fairly be said to be present by invitation. T. & P. Ry. Co. v. Watkins, 88 Tex. 20, 29 S. W. 232."

In section 105 he says:

"Persons entering for their own pleasure or advantage on the premises of another by the permission, express or implied, of the owner or the occupier, are licensees. They take the premises as they find them; a mere naked license imposes no duty on the owner or occupier to provide against dangers or accidents growing out of unsafe condition of the premises."

Thus it will be seen that this writer draws the distinction between a licensee and an invitee from the standpoint of the mutual interest in the work under consideration. Words & Phrases, Second Series, vol. 2, pp. 1190, 1193.

Mr. Cooley, in his splendid work on Torts (3d Ed.) vol. 2, p. 1258, says:

"It has been stated on a preceding page that one is under no obligation to keep his premises in safe condition for the visits of trespassers [citing many authorities]. On the other hand, when he expressly or by implication invites others to come upon his premises, whether for business or any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit."

Again, on page 1265, this able author says:

"An invitation may be inferred when there is a common interest of mutual advantage, a license when the object is the mere pleasure or benefit of the person using it. A United States revenue officer assigned a duty in a distillery and required to visit all parts of same daily, is there at the implied invitation of the owner—citing Anderson & Nelson Dis. Co. v. Hair, 103 Ky. 196 [44 S. W. 658]."

It has been decided by eminent authority that where a city and light company use each other's poles for electric wires, there is an implied invitation by each to the servants of the other to use its poles, and care is owed accordingly. Barker v. Boston Electric Light Co., 178 Mass. 503, 60 N. E. 2; Mackie v. Heywood & M. Rattan Co., 88 Ill. App. 119.

So, too, Judge Townes, in his estimable work on Torts, pages 224–234, announces the doctrine of liability to one legally upon the private property of another, in the following language:

"As these persons have a legal right to enter the premises, their coming onto it does not make them wrongdoers, and beside, as this right exists, the owner would ordinarily be charged with notice of the fact that the right may be exercised, at proper times and in proper ways. He must, therefore, maintain the premises with a view to this right, and as a rule could not excuse the bad condition of the premises by saying he was not expecting the entry at the time it

was made. The nature and extent of the right to enter *depends in each case upon the facts*, and in each instance these must be taken into account in determining the degree of care and the fact or not of its exercise. Again, a person may have the right to go upon one part of the premises and have no such right as to another part, or a right to enter at one time of day but not at another. These matters are all determined by the facts of the case. But granting that the person is on the premises in the exercise of a legal right then existing in him, the duty of the owner of the premises toward him is to use ordinary care to have and keep the premises in such condition that the person so rightfully thereon will not be injured by them. If he does this he is not liable for any injury received. If he does not do this, and the person on the premises in the exercise of a legal right is injured on account of an unsafe condition, without negligence or other legal fault on his part, he can recover."

Again, on page 231, he says:

"The owner of property or one responsible for its condition must use reasonable and ordinary care to keep it in such condition as not to injure persons rightfully thereon in response to invitation. What facts constitute such care must be determined by the circumstances of each case. Among these circumstances to be considered are the conditions under which the injured person entered. If he came at a time previously agreed upon between him and the person in charge of the premises, or at such a time as such person had reason to expect him, this should be taken into account in determining the question of care. If he comes under implied license, under circumstances not carrying any notice as to his prospective presence, this may be looked to in the question of determining reasonable care."

Mr. Webb (Webb's Pollock on Tort [Enlarged American Edition] pp. 627, 628) thus announces the rule:

"It is hardly needful to add that a customer, or other person entitled to the right measure of care, is protected not only while he is actually doing his business, but while he is entering and leaving.

"And the amount of care required is so carefully indicated by Willes, J., that little remains to be said on that score. The recent cases are important chiefly as showing in respect to what kind of property the duty exists and what persons have the same rights as customers. In both instances the law seems to have become on the whole more stringent in the present generation. With regard to the person, one requires this right to safety by being upon the spot, or engaged in work on or about the property whose condition is in question in the course of any business in which the occupier has an interest. It is not necessary that there should be any direct or apparent benefit to the occupier from the particular transaction.

"Where a gangway for access to ships in a dock was provided by the dock company, the company has been held answerable for the safe condition to a person having lawful business on board one of these ships, for the provision of access for all such persons is a part of a dock owner's business; they are paid for it by the owners of ships on behalf of all who use it.

"A workman was employed under contract with the shipowner to paint his ship lying in a dry dock, and the dockowner provided the staging for the workman's use; a rope by which the staging was supported, not being of proper strength, broke and let down the staging and the man fell into the dock and was hurt; the dockowner was held liable to him.

"It was contended that the staging had been delivered into the control of the shipowner and became as it were part of the ship; but this was held no reason for discharging the dockowner from responsibility for the condition of the staging as it was delivered. Persons doing work on ships in the dock must be considered as invited by the dockowner to use the dock and all appliances provided by the dockowner as incident to the use of the dock."

In Bennett v. Railway Co., 102 U. S. 577–586, 26 L. Ed. 235, Bennett, the appellant, was a traveler on the railroad from Vernon to Danville, Tenn. At Danville he was to take boat. The railway company had constructed a plank gangway to the wharf boat, where the passenger boat landed. A stationary engine was used at the wharf to draw loads, merchandise, etc., from the boat through hatchways. Bennett heard the whistle of the passenger boat and hurriedly left his hotel, with a lighted lantern, and, by direction of the hotel proprietor, took the gangway across the marshy ground between the hotel and the wharf boat. The wind blew his lantern out, but being able to discern the plank walk he proceeded to the wharf boat; but upon arriving stepped into one of the unguarded hatchways and was injured. His trip and paid passage on the railroad had ended; but mutual interest between the railway company and the navigation company was pleaded. Demurrers to the petition were sustained by the trial court, and Justice Harlan, in passing upon the case, in his opinion said:

"The facts disclosed by the pleadings, and by the demurrer conceded to exist, seem to bring this case within the rule, founded in justice and necessity, and illustrated in many adjudged cases in the American courts, that the owner or occupant of land who, by *invitation, express or implied, induces or leads others to come upon his premises, for any lawful purpose, is liable in damages to such persons* [Italics ours, except word "invitation"], they using due care, for injury occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist, without timely notice to the public, or to those who were likely to act upon such invitation—citing Railway Co. v. Hanning, 15 Wall. (82 U. S.) 649 [21 L. Ed. 220]; Carleton v. Iron & Steel Co., 99 Mass. 216; Sweeney v. Railway Co., 10 Allen [92 Mass.] 368 [87 Am. Dec. 644]; Warrenton on Negligence, §§ 349, 352; Cooley on Torts, 604–607, and authorities cited by those authors."

We have already cited Mr. Cooley in a later edition of his work.

"The last-named authority says that when 'one expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.' "

In the same opinion, this able jurist says:

"It is sometimes difficult to determine whether the circumstances make a case of *invitation*, in the technical sense of that word, as used in a large number of adjudged cases, or only a case of mere license. 'The principle,' says Mr. Campbell, in his treatise on negligence, 'appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.' "

The rule seems to be well settled that facts such as are presented in this case make Rodgers an invitee, and, further, his work was to the mutual interest of all the defendants, and his work was an incident to the performance of the contract among them, and such being true, the Foster Lumber Company owed him the duty of ordinary care to keep its tramroad in a reasonably safe condition for him to pass over to get to the ties where the Foster Lumber Company had collected them on its tramroad for inspection. Appellant's first, second, third, fourth, and fifth assignments of error are therefore overruled.

Appellant's sixth assignment of error is as follows:

"The trial court erred in giving that part of his charge to the jury reading as follows: 'A licensee is one who is on the premises of another without an invitation, either express or implied, for his own pleasure or convenience, but with the consent or acquiescence of the owner of the premises,' for that the same does not give a complete definition of the term 'licensee,' in this: That if one is upon the premises of another without invitation, express or implied, whether he is there for his own pleasure or convenience, or in the performance of a duty for another than the owner of the premises, he is still a licensee; to the giving of which this defendant filed its exception."

He presents under this assignment the following proposition:

"An uninvited person on the premises of another, by consent or acquiescence of the owner, is a licensee, whether there for his own pleasure or convenience, or in the performance of a duty for another than the owner; and if plaintiff was upon the tramroad of the Foster Lumber Company in the performance of a duty or obligation for or to the Gulf, Colorado & Santa Fé Railroad Company, or Kirby Lumber Company, he was still a licensee as to the Foster Lumber Company, and under the circumstances of this case the omission to give such definition to the jury was prejudicial error as to the Foster Lumber Company."

This proposition is followed by the following statement:

"The charge of the court on page 23 of the transcript, showing the language of the court as quoted in the assignment.

"Exceptions filed and found on page 26 of the transcript.

"Sixth assignment of error in motion for new trial, page 41 of the transcript.

"Bill of exceptions No. 1, taken to the overruling of the exceptions entered to the charge, page 48 of the transcript.

"The court is also referred to statement under first assignment of error, showing that plaintiff was in the employ of the railroad company, and acting under the contract between railroad company and the Kirby Company, and at the time of the accident was in the performance of such employment and duty, and was there in the interest and for the benefit of said railroad company, and Kirby Company."

Then follows the seventh, eighth, ninth, tenth, and eleventh assignments of error, each of which is followed by similar statements as is presented under the sixth assignment.

The appellee has raised objection to the court's consideration of each of these assignments of error, on the grounds:

(1) That it does not appear from the statement thereunder that any objections were filed to this part of the court's charge, or, if any objections were filed, what those objections were; wherefore the statement in support of the proposition under said assignment is wholly insufficient.

(2) Because the statement thereunder does not show that any exceptions were filed to said part of the court's charge before the court read its charge to the jury, nor when said objections, if any, were filed thereto.

(3) Because said statement thereunder does not show when the exceptions, if any, were taken to the overruling of objections, if any, to the court's charge.

(4) Because said statement does not set out the evidence pertinent to said issue, nor does it refer to the pages of the statement of facts where same can be found, but merely refers to another statement, without even referring to the pages of the brief, on which said other statement can be found.

[2] Under these four objections, it has been held many times by the appellate courts of this state that a statement which merely refers the court to pages of the record is insufficient. The substantial matter referred to must be set forth in the statement, and should be followed by reference to pages of the record.

For authorities pertinent to these objections, see Lupton v. Willmar, 154 S. W. 261; Griffin v. State, 147 S. W. 328; Railway v. Olds, 112 S. W. 787; Vann v. Denson, 56 Tex. Civ. App. 220, 120 S. W. 1020; Stockwell v. Glaspey, 160 S. W. 1151.

As to authority on statement failing to show exceptions filed, see article 1971, Vernon's Sayles' Civ. Statutes; Gillett v. Hooligan, 162 S. W. 367; Railway Co. v. Reed, 165 S. W. 4; Carlock v. Willard, 149 S. W. 363; Hulme v. Levis-Zuloski Mercantile Co., 149 S. W. 781; as to time of taking exceptions, see Gillett v. Hooligan, 162 S. W. 367; Railway Co. v. Reed, 165 S. W. 4; and as to the statement not setting out the facts pertinent to the issue, see Moore v. Miller, 155 S. W. 573; Fuel Co. v. Ellis, 162 S. W. 911; Bute v. Williams, 162 S. W. 989; Daugherty v. Wiles, 156 S. W. 1089.

This court has been very liberal in its consideration of assignments of error where objections have not been urged to them, but it has been decided a number of times by our appellate courts that where objections are urged, and the brief is not in accordance with the rules, as promulgated by the Supreme Court and by the statute, that the appellate court has no alternative in the matter, if the objections are well taken, other than to decline to consider the assignments. See De Lay et al. v. Wolffarth, 154 S. W. 1031; El Paso Electric Ry. Co. v. Lee, 157 S. W. 748; Greene Gold-Silver, etc., Co. v. Silbert, 158 S. W. 803; Cain v. Delaney, 157 S. W. 751. However, a casual reading of each of appellant's assignments of error, be-

ginning with the sixth and including the eleventh, discloses that our disposition of the first five assignments of error would dispose of these assignments, if no objection was urged to them.

Appellant's twelfth assignment of error is:

"The amount of the verdict is excessive, showing that the same was rendered under the influence of passion."

The statement following it is:

"Fifth assignment of error in motion for new trial, page 41 of the transcript."

And following this is a lengthy statement of the testimony pertinent to this assignment, which we will not attempt to copy in full, but take extracts from the testimony as quoted in the statement more directly as to this issue.

Dr. J. T. Roberts testified that the kneecap was dislocated for half or three-fourths of an inch; that part of the quadriceps extenso muscles of the kneejoint were partially torn loose, and that that muscle had all to do with the extension of the knee; that it was the muscle that controlled the power of a man's knee, and bends it backward and forward; that it is a primary muscle in controlling that movement and the effect of tearing that muscle partially loose is to impair a man's ability to walk; that he found also an extravasation of the synovial fluid below the joint capsule; that the synovial fluid is the fluid that belongs in the kneecap, and is for the purpose of lubricating the kneejoint, and that in plaintiff's case the fluid is leaking out and wasting away, and that such leaking makes it hard upon plaintiff's power to walk and ability to get around on his feet, and involves both pain and difficulty; that the effect is to prevent plaintiff from being active on his feet like a man that has to do manual labor; that he could get around as long as some of the synovial fluid is left, but after it is all gone, it would be almost impossible for him to get around; that in view of the fact that plaintiff was injured in 1913, and has been limping ever since in connection with the condition as he found him in, in his opinion plaintiff's injuries are permanent; that the muscle that he spoke of is practically torn away, and that if it was entirely torn away, plaintiff would not have any extension; that by the term "extension" he meant the ability to raise the leg; that he would say that the plaintiff has about 40 per cent. or something like that of extension as compared with the normal extension, and that he thought that about two-thirds of the tendon is torn loose, but that that was an estimate; that the part where the muscle was torn off had healed, but it is not in apposition—that is, not in normal position; that he could not tell whether the loss of the leakage of synovial fluid had stopped or not, but so far as he could tell he did not think the loss was stopped now, because there is still a swelling in the joint; that plaintiff could walk, but it would be painful, and the more he worked, the worse it would be.

Rodgers testified that he was a little past 42 years old, and had been engaged in the timber business inspecting, and that his work required manual labor and activity; that he was hurt about the middle of February, 1913, and since that time he had not performed the duty of tie inspector to what he should do it. For a while he could hold a job, but would soon lose out, because unable to do the work; that he had been in no physical condition to hold a job as tie inspector since he was injured, and was not at work at that time; that he had earned some money just about half the time since he was injured; that he had had a trial at three or four different jobs, but only had one that he had for any length of time; that he could not make a full hand at anything that required activity on his feet and strength in getting about; that a part of the time since he got hurt, he walked on a crutch, and part of the time with a stick, and since then he had just been hopping about the best he could; that in walking he carried his left leg stiff in order to keep from bending it too much; that his knee would bend, but it hurt when he bent it; that he had suffered pain as a result of the injury; that he did not believe there had been three hours during any day but that his knee bothered him, and that sometimes he was awake until 2 or 3 at night bathing it and keeping hot towels on it; and that his shoulder was hurt and bruised at the same time his knee was hurt, but his shoulder had gotten all right, except that when he went to use an axe his shoulder hurt; that at the time of the accident he had a "mighty" bad bruised-up knee and bruised-up shoulder, and skinned up all over; that when the car stopped he was lying on the ground, fell in among the ties; it was knocked off, and he was trying to run to keep the car from getting on top of him; that he was conscious at the time and that they helped him up and got a wagon and hauled him into Cleveland.

The doctor also testified:

"When I say that plaintiff's injury is permanent, I mean that he will always be crippled in that kneejoint. He will never have the full use of it."

[3] We do not think, under these facts, it can be said that the jury did not have evidence sufficient to warrant a finding in damages for the plaintiff in the sum it did find. This prerogative belongs, peculiarly, to the jury, and appellate courts should not disturb the finding, unless the record discloses that the jury has abused its authority or has been unduly influenced in some manner, and the record clearly shows it to be excessive. I. & G. N. Ry. Co. v. Brett, 61 Tex. 483; San Antonio & A. P. Ry. Co. v. Long, 28 S. W. 214; G., C. & S. F. Ry. Co. v. Silliphant, 70 Tex. 623, 8 S. W. 673.

In the last-cited case, the appellee, Silliphant, suffered a permanent injury and suf-

fered great pain and he secured a judgment of $10,000, and Justice Walker, writing the opinion for the Supreme Court, says:

"The verdict is large, and it is claimed to be excessive. The expert medical testimony is contradictory as to the probability of final and complete recovery by plaintiff from the effects of his injuries. That his injuries were serious, his loss of time great, and his physical pain intense and protracted, is not in dispute. The amount is not so great as to show prejudice or misconduct on part of the jury"

—citing Heath v. Garrett, 50 Tex. 266, T. & P. Ry. Co. v. O'Donnell, 58 Tex. 42, Galveston Oil Co. v. Malin, 60 Tex. 646, I. & G. N. Ry. Co. v. Brett, 61 Tex. 484, Manchaca v. Field, 62 Tex. 135, and T. & P. Ry. Co. v. Hardin, 62 Tex. 368; and the Supreme Court affirmed the judgment.

It seems to be the rule that before appellate courts will disturb a finding of a jury as to amount of damages, it must appear clearly that the amount is excessive.

In Railway Co. v. Porfert, 72 Tex. 353, 10 S. W. 207, the Supreme Court, in passing upon an assignment that the damages were excessive, the judgment being for the sum of $14,167, said:

"The verdict was large, but not so clearly excessive as to require us to set it aside after it has been approved by the trial judge"—citing Railway Co. v. Dorsey, 66 Tex. 148 [18 S. W. 444]; Railway Co. v. Garcia, 62 Tex. 292, and other authorities.

There is nothing in this record to show any undue influence over the jury or any prejudice against the defendant, or bias in behalf of the plaintiff, and under the facts of the case, we do not think that the amount awarded by the jury, though large, would require a reversal of the case upon the assignment of excessive damages. Appellant's twelfth assignment is overruled.

[4] No appeal is perfected in this case by the plaintiff against the judgment in favor of the Kirby Lumber Company, nor were there any cross-pleadings between any of the defendants. Such being the case, the Kirby Lumber Company is entitled to have the judgment in its favor affirmed, and its attorneys have filed its motion in this court asking that such be affirmed, and such motion, we think, is well taken, and that part of the judgment would be affirmed in any instance. Authorities: Hamilton & Co. v. Wm. Prescott, 73 Tex. 565, 11 S. W. 548; Anders v. Spalding, 44 S. W. 298; Wimple v. Patterson, 117 S. W. 1037; H. E. & W. T. Ry. Co. v. Moyer, 128 S. W. 1135; O'Donnell v. Kirkes, 147 S. W. 1167.

This disposes of each issue presented to us for review, and no error appearing, we are of opinion that the case should be affirmed; and it is so ordered.

### On Motion for Rehearing.

Appellant, in its motion for rehearing, complains of the findings of fact, as stated by this court in the original opinion, as follows:

"In the presentation of the facts by the court, the following is said:

"J. B. Rodgers, tie inspector, made reports of his inspection to the Gulf, Colorado & Santa Fé Railroad Company, to the Kirby Lumber Company, and to the Foster Lumber Company, and upon these reports of inspection by Rodgers, the Kirby Lumber Company and Foster Lumber Company each got pay for the ties.

"In this statement, so far as the Foster Lumber Company is concerned, I think it was an error, in this, that the evidence shows that the inspector did not make any report to Foster Lumber Company, but in his report to Kirby Lumber Company, it was stated what ties came from the Foster Lumber Company tram, and what came from other places, but neither the report of inspection or a copy thereof was sent to Foster Lumber Company. This you will find in the testimony of T. E. Heath on pages 11-12, statement of facts."

Following this statement, appellant's counsel says this ought to have a material effect, for, instead of showing there was a recognized relation between Foster Lumber Company and the railroad company, the exact opposite appears.

By reference to pages 11 and 12 of the statement of facts, we find the following testimony by Mr. Heath:

"D. J. Flaven represented the Kirby Lumber Company at Silsbee in arranging to have these ties inspected. As to whether or not the Kirby Lumber Company was buying the ties from the Foster Lumber Company to fill its contract with the railroad—we give the Foster Lumber Company a certificate for them. I don't know whether I signed the certificate upon this occasion, or Mr. Rodgers. I do not think I have got the report here. I have no copy of that report, but I presume Mr. Rodgers signed the report; if he did not, I did.

"Whenever I made an inspection over there and finished the inspection I gave the Foster Lumber Company a certificate of so many ties taken up on that tram, to apply on the Kirby Lumber Company contract. I do not know how many ties we took up on the Foster Lumber Company tram on the trip when Mr. Rodgers was injured. The report shows we took up 1579 ties on said trip.

"As to whether or not the Foster Lumber Company knew that these ties had to be inspected before they could get their money for them—it was customary to have them inspected, with the Foster Lumber Company and the Kirby Lumber Company and the Santa Fé. They all knew about that custom and acted upon it."

Appellant complains again at the following language used in the statement of the case in the original opinion:

"The Foster Lumber Company could have taken the tie inspector out on the tramroad with its locomotive, but did not do so, and the gasoline motor car was a better and more economical way of getting out to the ties to inspect them, and was much lighter on the tram than the locomotive."

On pages 60 and 61 of the statement of facts, Mr. Womack, the Foster Lumber Company's man, testified as follows:

"I suppose the most convenient way of getting from place to place on that track was to take the locomotive. Possibly the quickest and most convenient way would be either by motor car or by locomotive. * * * I suppose it is true that with four or five men going along to inspect ties, the most economical and quickest way would be by gasoline-propelled vehicle. It is cheaper to run than a locomotive."

On pages 18 and 19 of the statement of facts, Mr. Heath, testifying, said:

"We would have ridden an engine out to carry the inspector. The Foster Lumber Company could not have sold those ties to the Kirby Lumber Company and the Kirby Lumber Company sold them to the Santa Fé without having them inspected. The motor car was the customary method of transporting the inspector to the place where the ties were to be found. That was known to each of these companies, and acquiesced in by them and participated in by them."

On page 27 of the statement of facts, Mr. Flaven testified:

"It is true that when the Kirby Lumber Company's motor car would go out for these ties to be inspected, they would take the Santa Fé inspector on that motor car, and also the inspector of the person they were buying from, purely as a matter of convenience. They would have to do that or furnish transportation themselves. It was more convenient to do it that way than any other way. In some of the territory the situation was that the Kirby Lumber Company had a motor car and a man to run the car, and it was convenient for it to take its own men and also the Santa Fé man along with them. Some of the subcontractors had their own cars."

The testimony copied above, we think, warrants the statement complained of by appellant, but out of deference to appellant's counsel, we change that statement and make it read as follows:

"The inspector could have gone out on the tramroad in a locomotive, but did not do so, and the gasoline motor car was a better and more economical way of getting out to the ties to inspect them. It was much lighter on the track than the locomotive."

Appellant complains again of this statement by this court in the original opinion:

"The Gulf, Colorado & Santa Fé Railroad Company's agent, after inspecting the ties, made triplicate reports, one to the appellant, one to the Kirby Lumber Company, and one to his own company, and upon these reports appellant received its money."

Appellant's counsel says:

"This, I think, the court will find to be an error, and one which would change the entire relation of the parties. I am making these statements without having the statement of facts before me, but feel confident that they are right, and the court will so find them on more careful examination."

On page 35 of the statement of facts, Rodgers, testifying in his own behalf, said:

"It was my understanding that the Santa Fé was buying the ties from the Kirby Lumber Company, and that the Kirby Lumber Company was getting them from the Foster Lumber Company."

On page 36 he testified:

"I made out my report for hewn ties along the line of the G., C. & S. F. that I inspected as follows: We would tram them at the end of some subcontractor's division, and we would finish up the ties, and would set them down, and make out a certificate, and the Kirby Lumber Company's checker would sign it, and I also signed it, and the original was given to him (the subcontractor's agent) and the duplicate was sent to the Silsbee office, and when we finished our inspection and came in, we checked our books against the certificates and made out a general inspection sheet. When I was inspecting ties along the line of the G., C. & S.

F. I always sign my name as 'Tie Inspector G., C. & S. F.' I did not always put the 'G., C. & S. F.' on the certificate to the subcontractor, but when I signed the general certificate, I always signed it 'G., C. & S. F.' on it. The reports now shown me are carbon copies of some reports I made, and one is shown me that Mr. Heath made."

Mr. Womack, agent of the Foster Lumber Company, on page 57 of the statement of facts, testified:

"There might have been some reports signed by some Santa Fé inspector that was turned over to us from the Kirby Lumber Company; I don't know. I never saw one of those reports that were turned in."

Mr. E. C. Smith, manager of the Fostoria mill for the Foster Lumber Company, on page 71 of the statement of facts, testified:

"In February, 1913, the Foster Lumber Company had ties on the right of way of the tramroad, and they were inspected somewhere about the 15th or 18th of February. I do not know whether you would term a delivery of these ties under our contract with the Kirby Lumber Company when they were inspected, or when they were loaded up. I suppose you would term it a delivery on inspection, because we would get our report of them then. We got a report of the ties each month as they were inspected. We got that report from Mr. Hamblen, *and we would get a copy from the inspector.*"

We think these facts quoted above, both from plaintiff's and from defendant's witnesses, fully warrant our statement of the case complained of by appellant's counsel.

We have carefully considered appellant's motion for a rehearing in this case. There is nothing new presented in it, nor any new authorities cited, and we see no reason for changing our view, as expressed in the original opinion.

Appellant's motion for rehearing is therefore overruled.